# EXHIBIT A

1  DURIE TANGRI LLP
   DARALYN J. DURIE (SBN 169825)
2  ddurie@durietangri.com
   BENJAMIN B. AU (SBN 237854)
3  bau@durietangri.com
   RAGHAV KRISHNAPRIYAN (SBN 273411)
4  rkrishnapriyan@durietangri.com
   217 Leidesdorff Street
5  San Francisco, CA 94111
   Telephone: 415-362-6666
6  Facsimile: 415-236-6300

7  Attorneys for Plaintiff and Counterclaim-
   Defendant
8  CITY OF HOPE

9

10            IN THE UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12                    WESTERN DIVISION

   CITY OF HOPE,                      Case No. 2:17-cv-06201-RGK-JPR
13
                 Plaintiff/Counterclaim-   **FIRST AMENDED COMPLAINT**
14               Defendant,

15        v.

16  JUNO THERAPEUTICS, INC.,

17               Defendant/Counterclaim-
                 Plaintiff.
18

19

20

21

22

23

24

25

26

27

28

_____

Plaintiff and Counterclaim-Defendant City of Hope ("COH"), for its First Amended Complaint against Juno Therapeutics, Inc. ("Juno"), alleges as follows:

## NATURE OF THE ACTION

1.     City of Hope is one of the leading cancer research and treatment centers in the world.  It is one of only 49 comprehensive cancer centers in the nation, the highest designation possible from the National Cancer Institute, and it has been ranked as one of the nation's "Best Cancer Hospitals" by *U.S. News & World Report* for over 10 years.  In 2016, City of Hope won the Press Ganey Guardian of Excellence and Pinnacle of Excellence Awards, recognizing its high inpatient satisfaction scores.  City of Hope is also widely recognized as a leader in cancer research, with a history of important innovations that help patients around the world.

2.     City of Hope has revolutionized cancer treatment.  City of Hope is a leader in the treatment of hematological cancers, including leukemia and lymphoma, and a pioneer in the performance of bone marrow and blood stem cell transplants; it has performed more than 13,500 transplants with unparalleled survival rates—one of the largest programs in the United States.  In the 2016 fiscal year, City of Hope was awarded more than $87.8 million in research grants, and as of August 1, 2017, City of Hope had 63 active investigational new drug applications filed with the U.S. Food and Drug Administration. Since January 2009, City of Hope has had 84 first-in-human trials.  In a given year, City of Hope conducts more than 400 clinical trials enrolling more than 6,000 patients.  City of Hope has three manufacturing facilities on its campus that manufacture biologic and chemical compounds to good manufacturing (GMP) standards, quickly turning breakthrough discoveries into lifesaving therapies.  City of Hope inventors have received over 300 patents for their work.

3.     City of Hope's inventions include inventions relating to cancer immunotherapy—the use of the body's immune system to fight cancer.  One form of immunotherapy involves a modification of the patient's T-cells—a type of white blood cell.  The patient's T-cells are collected and re-engineered to produce proteins called

chimeric antigen receptors, or "CARs," on their surface.  The CARs allow the T-cells to recognize and target specific cancer cells.  The re-engineered CAR T cells are then multiplied and infused into patients, where they attack cancerous cells and can even protect against recurrence of the cancer.  City of Hope is one of a small group of cancer centers in the United States offering studies in CAR T therapy.  Its program is focused not only on leukemia, lymphoma and myeloma, but also on solid tumors including breast, liver and brain cancer.

4.    On November 1, 2009, City of Hope granted to a company called ZetaRX LLC an exclusive license to certain COH patents relating to CAR T therapy (the "COH IP").  A true and correct copy of that license (the "Exclusive License") is attached hereto as Exhibit A, and incorporated herein by reference.  Among other things, the COH IP relates to the production and dosage regulation of immunotherapy drugs.

5.    Juno has succeeded to ZetaRX LLC's rights and obligations under the Exclusive License.  COH and Juno entered into an amendment to the Exclusive License, effective May 19, 2016.  Juno has breached the express and implied terms of the Exclusive License, as amended, as set forth below.

## PARTIES

6.    Plaintiff COH is a California nonprofit public benefit corporation located outside of Los Angeles, California and has its principal place of business at 1500 E Duarte Rd, Duarte, CA 91010.

7.    Defendant Juno is a Delaware corporation and has its principal place of business at 307 Westlake Ave N #300, Seattle, WA 98109.

## JURISDICTION AND VENUE

8.    This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 (federal diversity jurisdiction) because Juno is a citizen of a different state than COH and the matter in controversy exceeds the sum or value of $75,000.

9.    Juno has consented to personal jurisdiction and venue in this District.  This action arises out of and relates to the Exclusive License, which states that "all disputes,

FIRST AMENDED COMPLAINT / CASE NO. 2:17-CV-06201-RGK-JPR

claims or proceedings between the Parties arising under this Agreement shall be brought to trial or other adjudication in the state or federal courts sitting in Los Angeles County, California."

## BACKGROUND

## JUNO'S PROMISES TO COH REGARDING SUBLICENSES

10.     The Exclusive License granted Juno an exclusive worldwide license to the COH IP in exchange for certain payments.

11.     The Exclusive License also granted Juno a limited right to sublicense the COH IP.

12.     The Exclusive License placed a number of restrictions on Juno's right to sublicense the COH IP.  For example, and without limitation, Section 2.2 of the Exclusive License forbids Juno from allowing its sublicensees to grant further sublicenses.

13.     In return for the limited right to sublicense the COH IP, Juno made several promises to COH.

14.     Juno promised that at least 15 days before sublicensing the COH IP, Juno would provide COH a signature copy of the proposed sublicense, including all exhibits or schedules referenced in the proposed sublicense.

15.     Juno promised to obtain COH's consent prior to sublicensing the COH IP.

16.     Juno promised to provide COH a final copy of each sublicense within 15 days of entering into it.

17.     Juno promised to pay to COH a percentage of "Sublicense Revenues."  The Exclusive License defines Sublicense Revenues to include "all consideration received by Zeta in return for the grant of rights to manufacture, use, offer for sell, or sell a Licensed Product, other than consideration in the form of:  (i) running royalties calculated as a function of Net Sales and payment, (ii) payment or reimbursement to Zeta of costs actually incurred by Zeta in conducting clinical trials of a Licensed Product, and (iii) reimbursement for actual Patent Expenses due pursuant to this Agreement."

18.     The Exclusive License defines "Licensed Product" as a compound, the

manufacture, use, offer for sale, or sale of which would infringe the COH IP but for the Exclusive License.

19.     After Juno had spent at least $5 million in direct and indirect costs related to the development and commercialization of Licensed Products, the Exclusive License required Juno to pay to COH 15% of all Sublicense Revenues, including Sublicense Revenues, such as stock, received in a form other than cash or cash equivalents.

20.     Juno has informed COH that it has spent at least $5 million prior to the events giving rise to this case.

21.     The Exclusive License requires Juno to pay COH 15% of all Sublicense Revenues.

22.     The Exclusive License provides for apportionment of revenue earned by sales that combine a Licensed Product with another product (a "combination product").

23.     In contrast to the terms regarding revenues for a combination product, the Exclusive License does not state that Juno's obligation to pay COH 15% of all Sublicense Revenues is reduced by a grant of rights to other products.

24.     With respect to royalty payments, the Exclusive License provides for certain offsets to account for non-COH IP.

25.     In contrast to the terms regarding royalty payments, the Exclusive License does not provide offsets or reductions to Juno's obligation to pay COH 15% of Sublicense Revenues even if Juno grants rights to non-COH IP in connection with a Licensed Product.

## JUNO BREACHES ITS PROMISES AND GRANTS A SUBLICENSE TO CELGENE WITHOUT NOTICE OR PERMISSION

26.     Juno is pursuing drugs that target a protein called CD19, which occurs on the surface of B cells ("Juno's CD19 program.").

27.     Juno's CD19 program includes drugs that constitute Licensed Products under the Exclusive License.  For example, and without limitation, compounds known as JCAR014, JCAR017, and JCAR021 are part of Juno's CD19 program and are Licensed

Products within the meaning of the Exclusive License.

## THE COLLABORATION AGREEMENT

28.    On June 29, 2015 Juno entered into a Master Research and Collaboration Agreement with Celgene Corporation and Celgene Rivot Ltd. (collectively, "Celgene"). On August 13, 2015, Juno entered into an Amended and Restated Master Research and Collaboration Agreement (the "Collaboration Agreement"), with Celgene.

29.    The Collaboration Agreement purported to sublicense COH IP to Celgene. For example, and without limitation, Section 3.1.1 of the Collaboration Agreement granted Celgene an exclusive option, exercisable in Celgene's sole and absolute discretion, to develop and commercialize drugs within Juno's CD19 program, including the Licensed Products within that program.  The form of the documentation required to exercise that option was attached as Exhibit A to the Collaboration Agreement.

30.    As a result of this option grant, Juno effectively relinquished the exclusive rights licensed in the COH IP by encumbering them with and through the Celgene option. The Celgene option rendered the COH IP unmarketable by Juno to any other company, and purported to give Celgene the right to make, use, or sell Licensed Product, provided only that Celgene make an additional payment to Juno.

31.    In addition, in Section 7.1.1a of the Collaboration Agreement, Juno purported to grant Celgene a "non-exclusive, worldwide, royalty-free right and license, with the right to grant sublicenses" to intellectual property that includes the COH IP.

32.    The Collaboration Agreement also purported to permit Celgene to grant further sublicenses.

33.    The Collaboration Agreement is a sublicense under Section 2.2 of the Exclusive License.

34.    Juno did not seek COH's consent prior to entering into the Collaboration Agreement.

35.    Juno did not provide COH a copy of the Collaboration Agreement prior to executing the Collaboration Agreement.

36. Section 6.1 of the Collaboration Agreement required Celgene to pay Juno $150,196,504 in cash in partial payment for the rights Juno granted Celgene under the Collaboration Agreement.

37. This $150,196,504 cash payment is Sublicense Revenues under the Exclusive License.

38. Juno did not pay COH 15% of $150,196,504, and has never offered to pay COH any fraction of the $150,196,504 cash payment.

## THE SHARE PURCHASE AGREEMENT

39. Juno also received consideration for the rights granted under the Collaboration Agreement via a June 29, 2015, Share Purchase Agreement ("Share Purchase Agreement") between Juno and Celgene.

40. Pursuant to the Share Purchase Agreement, Celgene paid a premium to purchase "9,137,672 shares of Common Stock, representing 10% of the outstanding shares of Common Stock" in Juno at the time. Specifically, Celgene paid Juno "the cash purchase price for the Closing Shares in the amount of $93.00 per share, or $849,803,496.00 in aggregate."

41. The $93.00 per share price specified in the Share Purchase Agreement represented a premium of $423,896,604 relative to the closing price of Juno's stock at the time of the Share Purchase Agreement.

42. The Share Purchase Agreement gave Celgene "top up" and "acquisition" rights to purchase additional Juno shares. Juno obtained the right to receive a premium for shares purchased over the number of shares provided by such "top up" rights.

43. The joint press release published by Celgene and Juno announcing the execution of the Collaboration Agreement stated that "[u]pon closing, Juno will receive an upfront payment of approximately $150 million, and in addition Celgene will purchase 9,137,672 shares of Juno's common stock at $93.00 per share."

44. The compensation Juno received under the Share Purchase Agreement constituted consideration for the rights granted under the Collaboration Agreement.

45.     The $423,896,604 premium Juno received under the Share Purchase Agreement is Sublicense Revenues under the Exclusive License.

46.     Juno did not pay COH 15% of this $423,896,604 premium, and indeed has never offered to pay COH any fraction of this consideration.

47.     Celgene has disclosed that it acquired Juno shares in the first quarter of 2016 for which it paid a premium.  Juno did not pay, and has not offered to pay, COH 15% of this premium.

### THE CELGENE OPTION EXERCISE

48.     On April 22, 2016, Celgene exercised the option with respect to products, including Licensed Products, that Celgene had received in the Collaboration Agreement (the "Celgene Option Exercise").

49.     Juno received a $50 million payment from Celgene when Celgene exercised its option.

50.     Juno did not disclose or pay to COH 15% of this $50 million payment within 15 days of Juno's receipt of this payment.

51.     Juno did not inform COH of the Celgene Option Exercise until June 2, 2017, over one year after Celgene exercised its option and Juno received its $50 million payment.  On June 2, 2017, Juno wrote COH and asserted that the $50 million payment was subject to apportionment.  A true and correct copy of this letter is attached hereto as Exhibit B.

52.     Juno's June 2, 2017 letter purported to apportion the payment it received for the Celgene Option Exercise into three categories: a drug called JCAR015, a drug called JCAR017, and a category Juno called "Future CD19 Products."

53.     Juno's June 2, 2017 letter asserted that JCAR015 was not a Licensed Product under the Exclusive License.  Juno purported to apportion 25% of the $50 million paid by Celgene to JCAR015.

54.     In March 2017, after patients in a clinical trial of JCAR015 died, and before writing its June 2 letter, Juno announced that it would not pursue further development of

JCAR015.

55.     Juno's June 2, 2017 letter stated that Juno assumed JCAR017 and Future CD19 Products were Licensed Products under the Exclusive License.

56.     Juno's June 2, 2017 letter purported to determine unilaterally that only $3.6 million of the $37.5 million that Juno allocated to Licensed Products constituted Sublicense Revenues generated by the Celgene Option Exercise.

57.     Juno's June 2, 2017 letter states that Juno allocated to JCAR017 $20 million of the $50 million Juno received pursuant to the Celgene Option Exercise.

58.     Juno's June 2, 2017 letter further states that Juno reduced this $20 million amount because other companies, including Juno, contributed relevant technology and know-how to JCAR017.  Juno allocated to COH only 13.3% of the $20 million it unilaterally allocated to JCAR017.  Juno allocated to itself 33.3% of this amount.  Juno therefore treated as Sublicense Revenues relating to JCAR017 only $2,666,668 of the $50 million Juno received pursuant to the Celgene Option Exercise.

59.     Juno's June 2, 2017 letter states that Juno allocated to Future CD19 Products $17.5 million of the $50 million Juno received pursuant to the Celgene Option Exercise.  Juno's letter further states that Juno reduced this $17.5 million amount because other companies, including Juno, contributed relevant technology and know-how to Future CD19 Products.  Juno allocated to COH only 5.6% of this $17.5 million allocation.  Juno allocated to itself 33.3 percent of this amount.  Juno therefore treated as Sublicense Revenues only $972,223 relating to Future CD19 Products of the $50 million Juno received pursuant to the Celgene Option Exercise.

60.     The Exclusive License requires Juno to pay COH 15% of all Sublicense Revenues.

61.     Juno itself calculated that it received at least $37.5 million in Sublicense Revenues pursuant to the Celgene Option Exercise, alone.

62.     Juno offered COH only $545,834 as all the payment ostensibly due to COH under the Exclusive License with respect to the Celgene Option Exercise.

## THE FINANCIAL EXTENT OF JUNO'S BREACH

63.     Under the terms of the Exclusive License, the full amount Juno has received under the Collaboration Agreement, the Share Purchase Agreement, and the Celgene Option Exercise constitutes Sublicense Revenues.

64.     Juno's June 2, 2017 letter offered COH no payment for revenue Juno received pursuant to the Collaboration Agreement.

65.     Juno's June 2, 2017 letter offered COH no payment for revenue Juno received pursuant to the Share Purchase Agreement.

66.     In sum, therefore, Juno has received over $625 million, not including interest, in consideration for its sublicense to Celgene, by which Celgene acquired rights with respect to Licensed Products.

67.     Under Section 3.5 of the Exclusive License, Juno was obligated to pay COH in excess of $93,750,000.

68.     Juno has not paid, and refuses to pay, 15% of all Sublicense Revenues.  Juno has not even offered to pay 15% of the (wrongfully determined) amount that Juno itself concedes are Sublicense Revenues.

69.     On August 4, 2017, COH provided Juno written notice of Juno's breaches of the Exclusive License.

70.     Juno failed to take any action to cure any of its breaches within 30 days of receipt of the August 4, 2017 notice.

71.     In view of Juno's breaches and its failure to cure them, the Exclusive License terminated on September 3, 2017.

## COUNT I: BREACH OF CONTRACT

72.     COH incorporates by reference the preceding paragraphs.

73.     COH has performed its obligations under the Exclusive License, except to the extent any such obligations have been excused.

74.     Juno has breached a material term of the Exclusive License by sublicensing COH IP without first securing COH's consent.

75. Juno has materially breached the Exclusive License by sublicensing COH IP without first securing COH's consent.

76. Juno has breached a material term of the Exclusive License by sublicensing COH IP without first providing a signature version of the agreement transferring those rights no less than 15 days before entering into that agreement.

77. Juno has materially breached the Exclusive License by sublicensing COH IP without first providing a signature version of the agreement transferring those rights no less than 15 days before entering into that agreement.

78. Juno has breached a material term of the Exclusive License by failing to pay COH 15% of all Sublicense Revenues.

79. Juno has materially breached the Exclusive License by failing to pay COH 15% of all Sublicense Revenues.

80. Juno has breached a material term of the Exclusive License by purporting to grant to Celgene the right to sublicense COH IP to other parties.

81. Juno has materially breached the Exclusive License by purporting to grant to Celgene the right to sublicense COH IP to other parties.

82. If Juno had disclosed to COH that Juno proposed to sublicense COH IP without paying COH 15% of all revenue received in connection with the agreements transferring those rights, or if Juno had disclosed to COH that Juno proposed to grant Celgene the right to sublicense COH IP, COH would not have consented to Juno's sublicense.

83. As a result of Juno's material breaches and breaches of material terms of the Exclusive License, COH sustained damages in an amount to be determined at trial, plus interest accrued, but no less than 15% of all consideration received by Juno in connection with the Collaboration Agreement, Share Purchase Agreement, and Celgene Option Exercise.

84. In addition to its express terms, the Exclusive License contains an implied covenant of good faith and fair dealing, which obliges Juno not to take actions with the

purpose or effect of denying COH the benefits of the Exclusive License.

85.    Juno breached the implied covenant of good faith and fair dealing by structuring its sublicense of COH IP in a way that purported to divide Sublicense Revenues among multiple agreements, and which purported to grant rights to make, use, or sell allegedly unlicensed products as well as Licensed Products.  Juno then used this structure to attempt to evade its obligation to pay COH 15% of all Sublicense Revenues.

86.    Juno's breach of the implied covenant of good faith and fair dealing includes, without limitation, Juno's effort unilaterally to rewrite the Exclusive License to include an apportionment of Sublicense Revenues that the Exclusive License explicitly does not include.

87.    COH would not have consented to Juno's sublicense to Celgene had Juno sought consent for its effort to structure its agreements to deprive COH of its right to receive 15% of all Sublicense Revenues.

88.    As a result of Juno's breaches of the covenant of good faith and fair dealing implied in the Exclusive License, COH has sustained damages in an amount to be determined at trial, plus interest accrued, but no less than 15% of all consideration received by Juno in the Collaboration Agreement, Share Purchase Agreement, and Celgene Option Exercise.

## COUNT II: DECLARATORY JUDGMENT

89.    COH incorporates by reference the preceding paragraphs.

90.    The Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., grants the Court, in cases of actual controversy such as this one, the power to issue judgments declaring the rights and other legal relations of any interested party, whether or not further relief is or could be sought.

91.    Disputes have arisen and now exist between COH and Juno regarding their respective rights and duties under the Exclusive License and regarding whether that license has terminated by reason of Juno's breaches, COH's August 4, 2017, written notice of Juno's such breaches, and Juno's failure to take any action within 30 days to

cure such breaches in response to that August 4, 2017 notice.

92.     These disputes include whether COH has consented to Juno's sublicense of COH IP, whether "Sublicense Revenues," as used in the Exclusive License, includes "all consideration received . . . in return for the grant of rights to manufacture, use, offer for sell [sic] or sell a Licensed Product," as COH maintains, or whether it encompasses only a fraction thereof, as Juno maintains, whether Juno may grant Celgene the right further to sublicense the COH IP, as Juno purports to have done, whether Juno has materially breached the Exclusive License, whether Juno has breached material terms of the Exclusive License, and whether the Exclusive License has terminated in view of Juno's breaches and Juno's failure to cure them.

93.     The Exclusive License permits COH to provide Juno with written notice of Juno's breaches and provides that the Exclusive License shall terminate automatically after 30 days if Juno fails to cure a material breach or breach of a material term.

94.     COH seeks a declaration that Juno has materially breached the Exclusive License and that Juno has breached material terms of that license.  Juno's material breaches and breaches of material terms include, without limitation:

        a.     Juno failed to provide COH with advance notice and a copy of the Collaboration Agreement or the Celgene Option Exercise;

        b.     Juno failed to seek COH's advance consent to the Collaboration Agreement or the Celgene Option Exercise;

        c.     Juno failed to pay COH 15% of all Sublicense Revenues within 15 days of receiving such revenue; and

        d.     Juno purported to grant Celgene the right further to sublicense COH IP.

95.     COH further seeks a declaration that the Exclusive License has terminated by virtue of Juno's material breaches and breaches of material terms of the Exclusive License and its failure to cure those breaches within the prescribed period of time.

## REQUEST FOR RELIEF

Wherefore, COH requests the following relief:

1.      Damages in an amount to be proven in trial, but no less than 15% of all consideration received by Juno pursuant to the Collaboration Agreement, Share Purchase Agreement, and Celgene Option Exercise.

2.      A declaration that Juno has materially breached the Exclusive License.

3.      A declaration that Juno has breached material terms of the Exclusive License.

4.      A declaration that the Exclusive License has terminated by reason of Juno's breaches of one or more material terms and/or Juno's material breach of the Exclusive License.

5.      Such other and further relief as the Court may deem proper.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), COH demands a jury trial on all issues so triable.

Dated:  September 21, 2017                    DURIE TANGRI LLP

                                              By: _____/s/ Daralyn J. Durie_____
                                                          DARALYN J. DURIE

                                              Attorneys for Plaintiff and Counterclaim-Defendant
                                              CITY OF HOPE

## CERTIFICATE OF SERVICE

I hereby certify that on September 21, 2017 the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing to the attorneys of record in this case.

*/s/ Daralyn J. Durie*
DARALYN J. DURIE